GARY M. RESTAINO
United States Attorney
District of Arizona
RYAN J. ELLERSICK
GORDON E. DAVENPORT III
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: ryan.ellersick3@usdoj.gov
Attorneys for Plaintiff

FILED

2023 APR 13 PM 1: 11

CLERK US DISTRICT COURT
DISTRICT OF ARIZONA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | **S U P E R S E D I N G**<br>**I N D I C T M E N T** |
|---|---|
| Plaintiff, | CR-22-00820-JCH-JR |
| vs. | Violations: |
| | 18 U.S.C. § 1349 (Conspiracy to<br>Commit Honest Services Wire Fraud)<br>Count 1 |
| Luis Manuel FLORES,<br>Constantine PANOUSOPOULOS, | 18 U.S.C. §§ 1343/1346<br>(Honest Services Wire Fraud Through<br>Bribery)<br>Counts 2-4 |
| Defendants. | 18 U.S.C. § 666(a)(2)<br>(Federal Funds Bribery)<br>Count 5 |
| | 18 U.S.C. § 1952(a)(3)(A)<br>(Travel Act)<br>Counts 6-8 |

**THE GRAND JURY CHARGES:**

At all times material to this Superseding Indictment, unless otherwise stated:

**<u>Introductory Allegations</u>**

1.      Defendant Constantine (aka "Dino") PANOUSOPOULOS was a large landowner residing in Santa Cruz County, Arizona, and was a principal, partner, member, or officer in various corporate and other business entities in the produce and real estate industries.

2.      Defendant Luis Manuel FLORES was a businessperson based in Nogales, Arizona, who acted as an agent for PANOUSOPOULOS in connection with certain property transactions and business before government agencies and bodies.

3.      Felipe Fuentes, who is charged elsewhere, was the elected County Assessor for Santa Cruz County, Arizona, having been elected to the position in 1998.  Santa Cruz County was a political subdivision within the State of Arizona.  As the elected County Assessor, Fuentes was an agent of Santa Cruz County.  During calendar years 2019 and 2020, Santa Cruz County received more than $10,000 from the United States under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

4.      Pursuant to Arizona state law, all county assessors in the State of Arizona were required to take the following oath or affirmation upon assuming office: "I do solemnly swear (or affirm) that I will well and truly discharge the duties of assessor of the county of _____, and will, to the best of my knowledge and ability, truly and fairly determine the valuation, without favor or partiality, of all the taxable property in said county at its full cash value."

5.      As an elected official in Santa Cruz County, Fuentes owed a fiduciary duty to Santa Cruz County and its citizens to perform the duties and responsibilities of his office free from corrupt influence.

6.      Person A was a close associate of Fuentes and resident of Santa Cruz County who engaged in part-time ranching activity.

7.      Person B was a staff appraiser in the Assessor's Office.

8.      Person C was a business partner with PANOUSOPOULOS in a town home development project.

Property Tax Valuations and Appeals

9.      Arizona law provided authority for the identification, classification, valuation, and assessment of real property in the state.

10.     The purpose of the property tax system was to fund local government budgets, schools, and special taxing districts.

11.     The elected County Assessor was responsible for identifying, classifying, valuing, and assessing real property in their jurisdiction.

12.     Prior to March 1 of each year, the County Assessor was required to provide a Notice of Value to all real property owners in their jurisdiction reflecting the full cash value and limited property value for the property.  The full cash value was generally considered the market value of the property.  The limited property value was the value used for assessing property taxes and was either equal to or less than the full cash value.

13.     A property owner who was dissatisfied with the County Assessor's valuation reflected on the Notice of Value could administratively appeal the decision to the County Assessor by filing a Petition for Review of Real Property Valuation. The County Assessor was required to rule on petitions by August of each year.  If an appeal was denied in whole or in part, the property owner could lodge a second-level appeal with the Board of Equalization.

14.     The County Assessor had authority to classify certain property as "agricultural" for tax purposes if the property met specific statutory criteria.  Property classified as "agricultural" was valued for tax purposes at a substantially lower rate than non-agricultural land, which resulted in substantial tax savings for property owners of "agricultural" land.

**COUNT ONE**
**18 U.S.C. § 1349**
**(Conspiracy to Commit Honest Services Wire Fraud)**

15.     The introductory allegations are re-alleged and incorporated by reference in Count One.

**The Conspiracy and Bribery Scheme**

16.     Beginning from a time unknown, but at least including in or about January 2015, to in or about April 2020, in the District of Arizona and elsewhere, the defendants,

Constantine PANOUSOPOULOS and Luis Manuel FLORES, knowingly and intentionally combined, conspired, confederated, and agreed with each other and other individuals known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of Santa Cruz County of their right to the honest services of Felipe Fuentes, the elected County Assessor, through bribery, in violation of 18 U.S.C. §§ 1343 and 1346.

### The Purpose of the Conspiracy and Bribery Scheme

17.     The purpose of the conspiracy and bribery scheme was for PANOUSOPOULOS and FLORES unlawfully to benefit and enrich themselves through bribery of Fuentes.

### The Manner and Means of the Conspiracy and Bribery Scheme

18.     The manner and means by which PANOUSOPOULOS and FLORES carried out the conspiracy and bribery scheme included, but were not limited to, the following:

19.     PANOUSOPOULOS and FLORES offered and provided to Fuentes things of value at different intervals during the course of the conspiracy as a stream of benefits with intent to influence Fuentes in the performance of official acts as specific opportunities pertaining to property valuations and classifications arose.

20.     The things of value that PANOUSOPOULOS and FLORES offered and provided to Fuentes as part of this stream of benefits included:

       a.     Thousands of dollars in cash payments.

       b.     Fuente's free use of an approximately 27-acre ranch and another large ranch parcel in Santa Cruz County owned by PANOUSOPOULOS.

       c.     Offers for Fuentes to stay at PANOUSOPOULOS's beachfront vacation property in San Carlos, Mexico.

21.     As part of the bribery scheme and in exchange for the things of value listed above, PANOUSOPOULOS and FLORES intended to influence Fuentes to perform and agree to perform the following official acts, among others:

1         a.     In 2015, classifying multiple parcels of land owned by PANOUSOPOULOS as "agricultural real property"—including the ranch parcels Fuentes used for free—thereby substantially reducing the assessed valuations of those parcels for tax purposes.

         b.     In 2018, reducing the assessed valuation of a large cement parcel owned by PANOUSOPOULOS by hundreds of thousands of dollars.

         c.     In early 2019, reducing assessed valuations on 10 out of the 11 properties PANOUSOPOULOS appealed that year.

         d.     In 2019, reducing assessed valuations on multiple lots associated with a town home development owned by PANOUSOPOULOS, without PANOUSOPOULOS having to go through the normal appeal process with the Assessor's Office.

         e.     In 2019, agreeing to provide a letter representing an inflated valuation for a mobile home park owned by PANOUSOPOULOS that was subject to eminent domain by the Arizona Department of Transportation.

         f.     In 2020, agreeing to further reduce the assessed valuation on the large cement parcel owned by PANOUSOPOULOS.

22.    PANOUSOPOULOS and FLORES used phones and e-mail to communicate in furtherance of the conspiracy, including communications that resulted in interstate wire transmissions.

23.    PANOUSOPOULOS used FLORES as a "middleman" to deliver cash bribe payments to Fuentes and to communicate with Fuentes in furtherance of the conspiracy.

24.    PANOUSOPOULOS and FLORES attempted to conceal the nature of the bribes through code words and other means. For example, when FLORES had a cash bribe payment to provide to Fuentes on PANOUSOPOULOS's behalf, FLORES would tell Fuentes that he had some "papers" or "files" in his office that Fuentes needed to review. Similarly, in order to conceal Fuentes's free use of PANOUSOPOULOS's ranch parcels, PANOUSOPOULOS and Fuentes used a sham lease agreement that listed the name of Person A instead of Fuentes's own name.

1

## Overt Acts of the Conspiracy and Bribery Scheme

2      25.    In furtherance of the conspiracy and bribery scheme, and to accomplish their

3   purposes, PANOUSOPOULOS, FLORES, and their co-conspirators, engaged in and

4   caused one or more of the following overt acts in the District of Arizona and elsewhere:

5

### Preston Mobile Home Park and $1,500 Bribe Payment

6      26.    In or about 2019, the Arizona Department of Transportation (ADOT) began

7   the process of acquiring private properties along Interstate 19 in Nogales as part of a project

8   to widen the interstate highway.  Adjacent to the highway was a large parcel called the

9   Preston Mobile Home Park, which was owned by PANOUSOPOULOS.  In furtherance of

10   the conspiracy and bribery scheme, PANOUSOPOULOS and FLORES conspired with

11   Fuentes to inflate the property value for the Preston Mobile Home Park in anticipation of

12   the acquisition by ADOT, in exchange for a cash payment to Fuentes to fund a trip for

13   Fuentes and his wife.

14      27.    On or about June 21, 2019, at approximately 10:22 AM, one of the staffers

15   in Fuentes's office emailed FLORES under the subject line "Preston" and wrote: "Right

16   now the value is at $0.75/a square foot, if you change it to commercial it will be at $3.00/a

17   square foot."

18      28.    On or about June 21, 2019, at approximately 12:46 PM, FLORES forwarded

19   the    staffer's    email    to    PANOUSOPOULOS's    son    who    was    involved    in

20   PANOUSOPOULOS's real estate business.

21      29.    On or about June 21, 2019, at approximately 1:12 PM, Fuentes spoke on the

22   phone with Person B in his office to ask if certain information had been relayed to

23   PANOUSOPOULOS.  Person B said the information provided was for "seventy-five cents

24   per square foot and the commercial land at three dollars."  Person B said the information

25   was needed to "present it to the ADOT."

26      30.    On or about June 21, 2019, at approximately 2:10 PM, Fuentes called

27   PANOUSOPOULOS's produce company, and asked to speak with PANOUSOPOULOS,

28

but PANOUSOPOULOS was not in the office. Fuentes then immediately called the office of PANOUSOPOULOS's real estate company and left a voicemail: "Mr. Dino, good afternoon. If you could give me a call back in regards to the Preston Mobile Home Park. Thank you."

31. On or about June 21, 2019, at approximately 3:54 PM, FLORES called Fuentes. During the call, FLORES and Fuentes discussed the following:

a. FLORES told Fuentes that ADOT was looking to acquire an acre of the trailer park for the highway project, and that PANOUSOPOULOS asked FLORES to consult with Fuentes about changing the land from multi-family to commercial. According to FLORES, "once it is changed to commercial . . . they have to pay us a bit better." At the same time, FLORES recognized that the property taxes would also increase because "tax is more expensive for commercial."

b. Fuentes confirmed that changing the trailer park to "commercial" would raise the taxes, not just on the single acre ADOT would be acquiring, but on the entire parcel. As an alternative, Fuentes proposed to FLORES that he "write up a letter for you, from me to you" reflecting an "estimated value" of four dollars per square foot, plus an additional 20 percent. According to Fuentes, that way they would not have to "change the parcel" but rather would "just have the opinion letter for the value from the assessor," and they could "present that" to ADOT. Fuentes said he thought that option would be "convenient for [PANOUSOPOULOS]."

c. After proposing to write a letter as County Assessor reflecting an inflated valuation for the parcel, Fuentes changed topics and said he had been meaning to call FLORES all week about a "dilemma." Fuentes expressed concern that they, "didn't give [PANOUSOPOULOS] everything he asked for" during the year, explaining that "from the 400 properties, [PANOUSOPOULOS] appealed seven or eight of them" and they "couldn't do anymore." FLORES said it was "understandable." Fuentes reminded FLORES that they had "already agreed on it . . . last year," that they were "not going to be

fighting." Fuentes added, signaling his imminent request for a bribe, "But now the one who is in need of something is me, Manuel."

        d.     At that point, Fuentes told FLORES that his wife was graduating from her online college program and was going to be receiving honors at the ceremony in Minnesota. Fuentes recounted the discussion between him and his wife about how they did not have the money to fly to Minnesota to attend the ceremony. The following exchange then took place:

| | |
|---|---|
| FUENTES: | And I wanted to ask your opinion, and see what you think— |
| FLORES: | Uh-huh. |
| FUENTES: | --since you work closer with [PANOUSOPOULOS]. |
| FLORES: | Yes. |
| FUENTES: | I really don't talk to him that much throughout the year, unless it's-- |
| FLORES: | Yes. |
| FUENTES: | --it's necessary. |
| FLORES: | I understand you perfectly. And honestly [Fuentes], there is no other option, you have to go. The thing is that we more or less... How much paperwork are we talking about? |
| FUENTES: | Of two. |
| FLORES: | Two? |
| FUENTES: | Because it would just be for the airplane. |
| FLORES: | Uh-huh. |
| FUENTES: | I already have enough for me. |
| FLORES: | You are talking about the rest? |
| FUENTES: | Uh-huh. |

| | | |
|---|---|---|
| 1 | FLORES: | All right, why don't you let me discuss it with |
| 2 | | [PANOUSOPOULOS] early tomorrow? When do you have to |
| 3 | | leave? |
| 4 | FUENTES: | No, me? Not until August. |
| 5 | FLORES: | Oh, we still have some time. |
| 6 | FUENTES: | It's the second week in August, yes. |
| 7 | FLORES: | Uh-huh. |
| 8 | FUENTES: | I said, "Well, maybe he will be a bit reluctant because, well, he |
| 9 | | will say…" |
| 10 | FLORES: | Because it didn't work out. No—no, because he would have |
| 11 | | told me from the beginning. |
| 12 | FUENTES: | Uh-huh. |
| 13 | FLORES: | And he understands many things. I'm sure that there is no |
| 14 | | problem. |
| 15 | FUENTES: | Oh, all right. So I said, "Well, I will tell Manuelito and…" |
| 16 | FLORES: | Of course—of course, yes, with pleasure. Leave that task up to |
| 17 | | me. |
| 18 | FUENTES: | And—and… |
| 19 | FLORES: | Yes? |
| 20 | FUENTES: | If it can be done, fine, and-- |
| 21 | FLORES: | And… |
| 22 | FUENTES: | --if not, well… |
| 23 | FLORES: | No—no, we will find a way. But yeah, [Fuentes], it can—can |
| 24 | | be done. Especially for something like that, right? Uh, let me, |
| 25 | | uh, mention it because I actually have to see him in the morning |
| 26 | | to discuss these little things that we are doing and, uh, and, I |
| 27 | | [stutters] will put that on the table. |
| 28 | | |

| | | |
|---|---|---|
| 1 | FUENTES: | Very well. Look, I will be out of town and I will be returning |
| 2 | | on Wednesday. Uh… |
| 3 | FLORES: | Take your time. In case everything goes well, I will just put all |
| 4 | | the paperwork away for you. |
| 5 | FUENTES: | No, just let me know and—and, like I told you, I don't—don't |
| 6 | | need it right now. |

32.    On or about June 24, 2019, FLORES left Fuentes a voicemail asking for a call back.  When Fuentes returned the call, FLORES stated that he had some "paperwork" for Fuentes and was "ready."  Because Fuentes was out of the state, FLORES advised that he would "keep it here in the file" until later in the week.  Fuentes asked FLORES, "How did [PANOUSOPOULOS] behave?  What did he tell you?  Are you guys okay?"  FLORES responded, "He told me that from all of the, uh, from all of the people that—that participated in the project, that you are the one that has the most merits."  Fuentes laughed.  FLORES added, "He told me, 'You know what?  The one who has the most merits here is [Fuentes] he told me."  Fuentes replied, "Oh, that's good.  That's good."  Fuentes thanked FLORES saying, "you don't know how much this means to me."  FLORES said, "I think I caught him in a good mood, you know," and added, "everything looks good."

33.    On or about June 28, 2019, FLORES called Fuentes to ask if he had arrived back in Nogales, and said he had the "file" for Fuentes at his office.  Fuentes said he would swing by.  About 20 minutes later, FLORES called to see where Fuentes was, and Fuentes said he was just down the street from FLORES's office.

34.    On or about June 28, 2019, FLORES paid Fuentes approximately $1,500 cash.

35.    On or about July 1, 2019, two airline tickets for flights from Tucson, Arizona to Minneapolis, Minnesota, were purchased from Fuentes's account.

36.    On or about July 5, 2019, $800 cash was deposited into Fuentes's bank account through an ATM deposit and $700 cash was deposited into Fuentes's bank account inside the branch office.

37.     On or about August 23, 2019, Fuentes and his wife travelled to Minneapolis, Minnesota, and attended the graduation ceremony for Fuentes's wife.

38.     On or about November 5, 2019, Fuentes called FLORES to thank him for the "gift" and asked that FLORES convey his appreciation to PANOUSOPOULOS. Fuentes said he "hadn't seen [PANOUSOPOULOS]," and he asked FLORES to pass along his thanks. FLORES said he would "let him know," and Fuentes interrupted, "No, look, thank you very much for the—for the gift that you gave me because, we had a really good time at my old lady's graduation. I didn't see him after that." FLORES responded, "Oh, okay. No, I will tell him. The friend hasn't been around. He was in Greece. He's just getting back. He got back two days ago." Later in the call, Fuentes again asked FLORES to "thank [PANOUSOPOULOS]." FLORES responded, "Of course, I will talk to him."

39.     On or about November 21, 2019, Fuentes had the following exchange with PANOUSOPOULOS after discussing PANOUSOPOULOS's recent trip to Greece:

FUENTES:              It was over there? [Laughs] That's good. That's good. [PANOUSOPOULOS], well, talking about vacations, I wanted to thank you for the money. I had a very nice time with my wife.

PANOUSOPOULOS:       We already talked about this. What—don't worry about anything.

FUENTES:              I won't worry about that. Well, thank you anyway.

PANOUSOPOULOS:       Yes, of course.

Reduction to Town Home Lot Values

40.     In or about 2017, PANOUSOPOULOS and Person C purchased 60 undeveloped townhome lots in Tubac, Arizona using a corporate entity called "Townhomes of Tubac, LLC."

41.     On or about April 4, 2019, shortly after receiving the Notice of Value for the townhome lots, Person C emailed PANOUSOPOULOS, "Good morning Constantino: I

1   think you mentioned something about Felipe adjusting the taxes on the lots to reflect
2   purchase price?  Please let me know que pasa.  I'm in Florida already but I can take care
3   of the appeal notice if they want to assess them to [sic] high.  Thanks!"

4         42.    On or about April 17, 2019, Person C emailed PANOUSOPOULOS under
5   the subject line, "60 Tubac Lots."  Person C attached to the email a "Notice of Value" dated
6   February 2019 for one of the town home lots showing that the assessed value for the
7   property was $2,478.  Person C wrote, "Dino.  It looks like the assessor has the value on
8   the lots at $2478.00 per lot when they should be $639.28 per lot.  I talked to [a staffer] from
9   the assessor office [sic] and he told me that you had made an agreement with Felipe already
10   as he agreed to adjust the assessed value due to utilities not being there.  Before I protest
11   them I thought I ran this by you [sic] as I don't want to screw up any agreement and him
12   valuing the property higher."

13         43.    On or about April 18, 2019, PANOUSOPOULOS forwarded the email from
14   Person C to Fuentes.

15         44.    On or about August 28, 2019, PANOUSOPOULOS called Fuentes about the
16   town home lots.  On the call, PANOUSOPOULOS explained that Person C had just spoken
17   with Person B at the Assessor's Office and that Person B had delivered "really really bad
18   news" about taxes and that "nothing was done with the plots of land," which were still
19   valued at the higher price.  Fuentes pushed back saying that "the plots of land we worked
20   on," and said he didn't "know why [Person B] said that," and added that he (Fuentes) would
21   get PANOUSOPOULOS some copies the following Monday (September 2).
22   PANOUSOPOULOS reminded Fuentes that Monday was a holiday (Labor Day), and
23   Fuentes said he would be in to work on Tuesday (September 3).

24         45.    On or about September 3, 2019, despite no appeal being filed with the
25   Assessor's Office, Person B individually reduced the assessed values on the remaining 48
26   undeveloped town home parcels down to $375.

27
28

1

Christmas Bribe Payment of $1,000

2        46.        On or about December 21, 2019, Fuentes and FLORES discussed a project
3    FLORES was working on with one of PANOUSOPOULOS's sons.  During the discussion,
4    FLORES told Fuentes, "We looked for you yesterday, [PANOUSOPOULOS] called me
5    and called you but your—your phone did not answer. I called you as well but my telephone
6    didn't—didn't connect; and he tells me, 'Listen, give—uh-[Fuentes]—of his own free will,
7    I-I didn't—didn't ask for anything,' he said, 'Give him this for Christmas.'  I don't know
8    if he called you, but [unintelligible]."   Fuentes interrupted and said that he was likely at a
9    basketball game when the call came in from FLORES, and Fuentes didn't recognize
10   FLORES's new phone number.  The following discussion then occurred:

11
12   FUENTES:            So this, why, what—what—what did he tell you?
13   FLORES:             For—Christmas.
     FUENTES:            Just a Christmas present?
14   FLORES:             [Unintelligible].
15   FUENTES:            Okay.
16   FLORES:             Normally I ask for it whenever [unintelligible], not this time.
17   FUENTES:            Yes, yes, you request it.
18   FLORES:             Not this time.
19   FUENTES:            Uh-huh.
20   FLORES:             Uhm, I arrived yesterday. What's more, I went to another deal
21                       there, and [PANOUSOPOULOS] told me, 'How did you know
22                       I was looking for you?' I told him, 'No, I'm here to see
23                       [unintelligible].' He said, 'Oh, that's good, that's good because
24                       I was looking for you.' So we went over there, and, uhm, he
25                       took it out and told me, 'Give this to [Fuentes].' I said, 'Look,
26                       I usually give him a small gift for Christmas, but I already sent
27                       it to him.' 'Oh, call him,' he said, 'and give it to him.' 'Fine.'
28

He—he didn't give me any further explanation. 'Alright,' I said. I called you right away because I wanted to give it to you, but when you didn't answer I took it to keep for you.

47.    Later in the conversation, Fuentes clarified, "Manuelito, regarding this, it's a gift . . . he doesn't expect anything?" FLORES responded, "Nothing at all."

48.    During the meeting, FLORES handed Fuentes a white envelope containing $1,000 cash.

49.    On or about January 7, 2020, Fuentes called PANOUSOPOULOS.  During the call, Fuentes told PANOUSOPOULOS, "And thank you very much.  Manuel saw me and—thank you very much for everything."  PANOUSOPOULOS responded, "That's good, that's good.   Merry Christ—Merry Christmas and Happy New Year, right? Christmas is past, but we're still looking forward to the New Year." Fuentes replied, "Still to come. Alright then, Mr. Dino."

<u>Warehouse Cement Parcel and $2,000 Bribe Payment</u>

50.    In or about 2018, Fuentes reduced the valuation of a large cement parcel situated between two warehouses owned by PANOUSOPOULOS from approximately $2 million to approximately $1.3 million.  As described below, PANOUSOPOULOS was not satisfied with that reduction and continued to complain to Fuentes about having to pay taxes on the cement parcel at all.

51.    On or about November 21, 2019, Fuentes and PANOUSOPOULOS had the following exchange about the cement parcel:

FUENTES:            Uhm, and another one where—there are—that may have something is going to be the cement cause I took that off.  If someone asks you something, no--

PANOUSOPOULOS:   Yes, but look, always—I'm still—you are suffering with that fucking cement; I am still angry about—because—it's a parking lot. Why do I have to pay so much money?

| | | |
|---|---|---|
| 1 | FUENTES: | Yes. |
| 2 | PANOUSOPOULOS: | That's neither here nor there now. |
| 3 | FUENTES: | Yes, we may not have a problem with that one; but it's going |
| 4 | | to stay that way, right. We can't lower it any more. |
| 5 | PANOUSOPOULOS: | Next year I'm going to go against you guys. I'm going to check |
| 6 | | what the ones in the county pay; what the ones—because they |
| 7 | | pay very little. I'm going to start point out, look, this, this and |
| 8 | | this building and comparing it with us.  We are the newest; the |
| 9 | | one in the county is ten years old. |
| 10 | FUENTES: | And it's larger. |
| 11 | PANOUSOPOULOS: | No, the one in the county is only 100,000; we are 200, but by |
| 12 | | foot-- |
| 13 | FUENTES: | That's why. |
| 14 | PANOUSOPOULOS: | --but I'm talking about by foot; by square foot.. |
| 15 | FUENTES: | Are you sure we are higher with you per foot? |
| 16 | PANOUSOPOULOS: | Yes. |
| 17 | FUENTES: | Oh, I don't think so. |

18        52.    On or about March 11, 2020, Fuentes and PANOUSOPOULOS exchanged
19 a series of phone calls, and the subject of the cement parcel was again brought up.  During
20 one of the calls, the following exchange occurred:

| | | |
|---|---|---|
| 21 | PANOUSOPOULOS: | What happened, [Fuentes]. |
| 22 | FUENTES: | Mr. Dino, very good afternoon. I am calling you because I had |
| 23 | | a question from this morning. Uhm, I'm going to retire, I'm |
| 24 | | gonna retire. That's the first thing I wanted to tell you. As far |
| 25 | | as—as far as the—the warehouses, I don't see a problem. |
| 26 | | Where I think we will have a problem, and I'll see how I can |
| 27 | | fix it—I was thinking about the cement. |
| 28 | | |

| | | |
|---|---|---|
| 1 | PANOUSOPOULOS: | Okay. |
| 2 | FUENTES: | The concrete parcel. |
| 3 | PANOUSOPOULOS: | Uh-huh. |
| 4 | FUENTES: | Because, it's like—500,000 or 800,000 I don't know how |
| 5 | | much it cost you. Uhm, and on that one, I'll see how I can fix |
| 6 | | it because if you put in a petition they won't—it won't pass. I |
| 7 | | mean, because it's—what [unintelligible] costs. |
| 8 | PANOUSOPOULOS: | Okay. Well what—when—when could we meet? |
| 9 | FUENTES: | Uhm, I think—tomorrow is—we can meet on Friday [March |
| 10 | | 13]. |
| 11 | PANOUSOPOULOS: | Okay. |

53.     On or about March 13, 2020, Fuentes and PANOUSOPOULOS met in PANOUSOPOULOS's office.  The valuation of PANOUSOPOULOS's warehouses was discussed, and PANOUSOPOULOS indicated he would appeal what he believed were high valuations.  Fuentes said he would talk to his staff and bring PANOUSOPOULOS the paperwork PANOUSOPOULOS needed to file the appeals.  Fuentes added, however, that there wasn't much PANOUSOPOULOS could do to appeal the valuation on the cement parcel.  PANOUSOPOULOS responded, "Okay. Okay, alright, it's fine. We'll let it go. You already told me through the [unintelligible]. I understood the message. Okay, we'll leave it alone. But—okay, it's a parking lot and we are paying a [unintelligible] of money for the fucking parking lot." As the meeting was ending, Fuentes said, "I'm going to see what we can do with—about the cement, Mr. Dino." PANOUSOPOULOS responded, "Okay." Fuentes continued, "And then I will settle with you. I will let you know." PANOUSOPOULOS replied, "That's fine."

54.     On or about March 16, 2020, Fuentes met with FLORES in FLORES's office.  After engaging in small talk, the following exchange about the cement parcel occurred:

| | | |
|---|---|---|
| 1 | FUENTES: | And—and—I went and spoke to [PANOUSOPOULOS] |
| 2 | | because he was complaining about some properties, but he has |
| 3 | | no problem with those because they will be reduced. |
| 4 | FLORES: | Mh-mh- |
| 5 | FUENTES: | Because they are wrong.  I told him, compare one to the other |
| 6 | | and— |
| 7 | FLORES: | [unintelligible]. |
| 8 | FUENTES: | --if we are wrong well— |
| 9 | FLORES: | No, well… |
| 10 | FUENTES: | --ap—appeal and it will go through. |
| 11 | FLORES: | Of course. |
| 12 | FUENTES: | The one he has a problem with since last year, Manuelito is |
| 13 | | the—you know how he divided the warehouses, Nora One and |
| 14 | | Nora Two. |
| 15 | FLORES: | Mh-hm. |
| 16 | FUENTES: | Between them is common area. |
| 17 | FLORES: | Yes. |
| 18 | FUENTES: | He made it all in cement. So on the cement he pays—we have |
| 19 | | it valued—I don't know, almost for $1,000,000.00 and he says |
| 20 | | it's not fair because it is cement. I had already told him that he |
| 21 | | would not win if he appeals because that is the value. So—I |
| 22 | | tried to tell him, but, you see, I have never dealt directly with |
| 23 | | him to say, "let's do this and let's." |
| 24 | FLORES: | Mh-hm. |
| 25 | FUENTES: | So, before I left—oh, I told  him, "Well, we can't do anything |
| 26 | | on the cement." So when I went today I told him, "I can fix the |
| 27 | | cement for you," he told me, "No, no, leave it that way. It |
| 28 | | |

| | | |
|---|---|---|
| 1 | | doesn't matter. If you can't do anything don't do it."  I don't |
| 2 | | know if you want to tell him— |
| 3 | FLORES: | Of course I will. |
| 4 | FUENTES: | --that we can fix the cement for him and for him to give me a |
| 5 | | Milanesa. |
| 6 | FLORES: | Yes. That's easy. |
| 7 | FUENTES: | Yes? |
| 8 | FLORES: | Yes. [PANOUSOPOULOS] would give it to you even without |
| 9 | | the cement. |
| 10 | FUENTES: | Well, but—if he says "no—" |
| 11 | FLORES: | Yes, exactly.  With pleasure, [Fuentes], I will arrange that for |
| 12 | | you today. |
| 13 | FUENTES: | Mh-hm. |
| 14 | FLORES: | Alright? And I will convince him for you today. |
| 15 | FUENTES: | No, well, whenever—whenever you can- |
| 16 | FLORES: | [Unintelligible] directly to him. |
| 17 | FUENTES: | ---not, not, not so in a rush. And—and I didn't dare tell him— |
| 18 | FLORES: | Mh-hm. |
| 19 | FUENTES: | --because I am embarrassed. |
| 20 | FLORES: | No, don't worry. I am an expert at that. |
| 21 | FUENTES: | [Laughs] |
| 22 | FLORES: | Nobody beats me at that shit.  Don't worry, uhm, |
| 23 | | [unintelligible]. Just to be a bit more educated, uh—regarding |
| 24 | | the cement—when you fix it, it—it will— |
| 25 | FUENTES: | It will be reduced. |
| 26 | FLORES: | It will be reduced or—[unintelligible]? |
| 27 | FUENTES: | Yes, because he pays about—about $36,000 in taxes for the |
| 28 | | cement alone. |

| | | |
|---|---|---|
| 1 | FLORES: | For the cement alone? And when—when it is fixed it will be |
| 2 | | reduced to—? |
| 3 | FUENTES: | Well, I don't know how much it can get it reduced where it |
| 4 | | won't look— |
| 5 | FLORES: | It won't look— |
| 6 | FUENTES: | --so blatant. |
| 7 | FLORES: | Okay, yes, that's good. Of course. |
| 8 | FUENTES: | Uh-I have to do it carefully. |
| 9 | FLORES: | Okay, no problem. Uhm, I will approach him with it today and |
| 10 | | probably by the weekend before [Fuentes] I will have your |
| 11 | | paper. |
| 12 | FUENTES: | That's good. |
| 13 | FLORES: | No problem. You know that I am awesome at that. |

14    55.    On or about March 18, 2020, Fuentes called FLORES.  During the phone

15  call, FLORES said that he was "just leaving [Fuentes's] compadre's office," and that "they

16  gave [FLORES] some papers to see if [Fuentes] would please go over them for

17  [FLORES]." Fuentes explained that he was not feeling well, and FLORES advised Fuentes

18  that he would "keep them here in [his] safe," and that it was "nothing urgent, it's just for

19  [Fuentes] to go over them."  Fuentes and FLORES discussed meeting up later in the day

20  or the following day.

21    56.    On or about March 19, 2020, Fuentes and FLORES met in FLORES's office.

22  After making small talk about the unfolding COVID-19 pandemic, the following exchange

23  occurred:

| | | |
|---|---|---|
| 24 | FUENTES: | I haven't seen the report from the Health Department. |
| 25 | FLORES: | That's right. Uh, I was talking to, to the friend and I told him… |
| 26 | | what you—more or less, the, the proposition that you had made |
| 27 | | me. [FLORES holds up one finger] |
| 28 | | |

| | |
|---|---|
| FUENTES: | One Milanesa. |
| FLORES: | And—Uh-huh. [FLORES holds up two fingers] |



| | |
|---|---|
| FUENTES: | He sent you two. |
| FLORES: | Yes. [FLORES hands an envelope to Fuentes] |



| | |
|---|---|
| FUENTES: | He sent you two—And, and… what did he say? Nothing? |
| FLORES: | He told me that—Nothing, that, on the contrary, they are very grateful for, for the work that we have done and… he made an interesting, eh, remark. He said, "Hey," he said, "…eh, we'd like to support this, this guy if he runs again. Uh, we can give him…" [FLORES holds up three fingers] |

| | | |
|---|---|---|
| 1 | FUENTES: | Um-hum. |
| 2 | FLORES: | Three thousand. Just to… to run, and… once you run and win, |
| 3 | | then you leave. |
| 4 | FUENTES: | [Clears throat] |
| 5 | FLORES: | I said, "I'm not sure if…" |
| 6 | FUENTES: | Well, no, because I already submitted all the paperwork. I |
| 7 | | already said I wasn't going to run. Not anymore, not anymore. |
| 8 | FLORES: | I forget. |
| 9 | FUENTES: | Hey, Manuelito, and did you tell him that I'm going to arrange |
| 10 | | the cement thing for him? |
| 11 | FLORES: | Yes, he was very pleased. I explained it to him. He also told |
| 12 | | me, "Yes," he said, "the thing is that [staffer from the |
| 13 | | Assessor's Office] got me," he said. "[That staffer]." |
| 14 | FUENTES: | [Sighs] |
| 15 | FLORES: | He said, "That [staffer] is… an asshole," he said, "but…sounds |
| 16 | | good," he said, "tell him to see if he can help us out." I said, |
| 17 | | "Of course, I'd be glad to, I'd be glad to." |
| 18 | FUENTES: | All right. |
| 19 | FLORES: | He did so very willingly, very willingly. |
| 20 | FUENTES: | That's great, Manuelito. |
| 21 | FLORES: | But [unintelligible] already came, he came because he came |
| 22 | | here with, with [unintelligible] |
| 23 | FUENTES: | Oh. |
| 24 | FLORES: | And, uh… he asked me if you had come. I said, "No," I said, |
| 25 | | "he called me yesterday to say he wasn't going to come |
| 26 | | because the weather was bad but he told me he was coming at |
| 27 | | 12:00." |
| 28 | | |

| | | |
|---|---|---|
| 1 | FUENTES: | Yes, yes, that way it's set. Okay, so then we are agreed that I |
| 2 | | will arrange it for him and— |
| 3 | FLORES: | Yes, it's all set. |
| 4 | FUENTES: | It's all set. Okay. |
| 5 | FLORES: | Yes, it's all, it's all in your hands and, uh, whatever you need, |
| 6 | | you know? |
| 7 | FUENTES: | So he sent you two Milanesas? |
| 8 | FLORES: | Two. |
| 9 | FUENTES: | Hm, that's great. |
| 10 | FLORES: | [Unintelligible] |
| 11 | FUENTES: | We're better off. |
| 12 | FLORES: | Yes, that's right. |
| 13 | FUENTES: | Manuel... |
| 14 | FLORES: | He is grateful. |
| 15 | FUENTES: | Well, you already know. |
| 16 | FLORES: | [Unintelligible] |
| 17 | FUENTES: | All set. Like— |
| 18 | FLORES: | Whatever you need. |
| 19 | FUENTES: | Likewise, Manuelito. You already know. Thank you. |
| 20 | FLORES: | See you later. |
| 21 | FUENTES: | See you later. |
| 22 | FLORES: | All right. |

23    57.    The envelope FLORES provided to Fuentes contained $2,000 cash.

24    All in violation of 18 U.S.C. § 1349.

25

26

27

28

## COUNTS TWO THROUGH FOUR
### 18 U.S.C. §§ 1343, 1346, 2
### (Honest Services Wire Fraud)

58.     The allegations contained in Paragraphs 1 through 57 of this Superseding Indictment are re-alleged as to Counts Two through Four.

59.     Beginning from a time unknown, but at least including in or about January 2015, to in or about April 2020, in the District of Arizona and elsewhere, the defendants, Constantine PANOUSOPOULOS and Luis Manuel FLORES, and other individuals known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and deprive the citizens of Santa Cruz County of their right to the honest services of Felipe Fuentes, the elected County Assessor, through bribery, in violation of 18 U.S.C. §§ 1343 and 1346.

### Execution of the Bribery Scheme

60.     On or about the dates listed below, in the District of Arizona and elsewhere, the defendants, Constantine PANOUSOPOULOS and Luis Manuel FLORES, aided and abetted by each other and others known and unknown to the Grand Jury, having devised and intending to devise the above-described scheme and artifice to defraud and deprive, and for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire and radio communications in interstate commerce, the following writings, signs, signals, and sounds:

| Count | Date | Wire Transmission |
|---|---|---|
| 2 | 04/18/2019 | E-mail transmission from PANOUSOPOULOS to Fuentes under the subject line "Fw: 60 Tubac Lots" in reference to the valuation of the townhome lots |
| 3 | 06/21/2019 | E-mail transmission from FLORES to PANOUSOPOULOS's son under the subject line "Fw: Preston" in reference to the Preston Mobile Home Park valuation |

| 4 | 06/24/2019 | Return phone call from Fuentes to FLORES in which FLORES advised Fuentes that he had some "paperwork" for Fuentes and was "ready" |
|---|---|---|

All in violation of 18 U.S.C. §§ 1343, 1346, and 2.

### COUNT FIVE
**18 U.S.C. § 666(a)(2)**
**(Federal Funds Bribery)**

61.     The allegations contained in Paragraphs 1 through 57 of this Superseding Indictment are re-alleged as to Count Five.

62.     Beginning in or about June 2019 and continuing through in or about April 2020, in the District of Arizona and elsewhere, the defendants, Constantine PANOUSOPOULOS and Luis Manuel FLORES, aided and abetted by each other and others known and unknown to the Grand Jury, corruptly gave, offered, and agreed to give anything of value to any person, with intent to influence and reward an agent of a local government; to wit, Felipe Fuentes, the elected County Assessor for Santa Cruz County, Arizona, in connection with any business, transaction, and series of transactions of such government, involving anything of value of $5,000 or more; to wit, property valuations for properties owned by PANOUSOPOULOS.

All in violation of 18 U.S.C. §§ 666(a)(2) and 2.

### COUNT SIX
**18 U.S.C. § 1952(a)(3)(A)**
**(Travel Act)**

63.     The allegations contained in Paragraphs 1 through 57 of this Superseding Indictment are re-alleged as to Count Six.

64.     On or about June 28, 2019, in the District of Arizona and elsewhere, the defendants, Constantine PANOUSOPOULOS and Luis Manuel FLORES, aided and abetted by each other and others known and unknown to the Grand Jury, used any facility in interstate commerce; to wit, a telephone, with intent to promote, manage, establish, carry

1   on, and facilitate the promotion, management, establishment, and carrying on, of any

2   unlawful activity; to wit, Bribery of a Public Servant in violation of Arizona Revised

3   Statutes § 13-2602(A)(1), and thereafter performed and attempted to perform an act in

4   violation of Arizona Revised Statutes § 13-2602(A)(1); to wit, conferring cash bribes and

5   other things of value upon Felipe Fuentes, the elected County Assessor, with intent to

6   influence Fuentes's judgment, exercise of discretion, and other action in his official

7   capacity as a public servant.

8        All in violation of 18 U.S.C. §§ 1952(a)(3)(A) and 2.

9                     **COUNT SEVEN**

10               **18 U.S.C. § 1952(a)(3)(A)**
                        **(Travel Act)**

11       65.     The allegations contained in Paragraphs 1 through 57 of this Superseding

12  Indictment are re-alleged as to Count Seven.

13       66.     On or about August 28, 2019, in the District of Arizona and elsewhere, the

14  defendants, Constantine PANOUSOPOULOS and Luis Manuel FLORES, aided and

15  abetted by each other and others known and unknown to the Grand Jury, used any facility

16  in interstate commerce; to wit, a telephone, with intent to promote, manage, establish, carry

17  on, and facilitate the promotion, management, establishment, and carrying on, of any

18  unlawful activity; to wit, Bribery of a Public Servant in violation of Arizona Revised

19  Statutes § 13-2602(A)(1), and thereafter performed and attempted to perform an act in

20  violation of Arizona Revised Statutes § 13-2602(A)(1); to wit, causing cash bribes and

21  other things of value to be conferred upon Felipe Fuentes, the elected County Assessor,

22  with intent to influence Fuentes's judgment, exercise of discretion, and other action in his

23  official capacity as a public servant.

24        All in violation of 18 U.S.C. §§ 1952(a)(3)(A) and 2.

25

26

27

28

1

**COUNT EIGHT**
**18 U.S.C. § 1952(a)(3)(A)**
2
**(Travel Act)**

3       67.     The allegations contained in Paragraphs 1 through 57 of this Superseding

4   Indictment are re-alleged as to Count Eight.

5       68.     On or about March 18, 2020, in the District of Arizona and elsewhere, the

6   defendants, Constantine PANOUSOPOULOS and Luis Manuel FLORES, aided and

7   abetted by each other and others known and unknown to the Grand Jury, used any facility

8   in interstate commerce; to wit, a telephone, with intent to promote, manage, establish, carry

9   on, and facilitate the promotion, management, establishment, and carrying on, of any

10   unlawful activity; to wit, Bribery of a Public Servant in violation of Arizona Revised

11   Statutes § 13-2602(A)(1), and thereafter performed and attempted to perform an act in

12   violation of Arizona Revised Statutes § 13-2602(A)(1); to wit, conferring a cash bribe and

13   other things of value upon Fuentes, the elected County Assessor, with intent to influence

14   Fuentes's judgment, exercise of discretion, and other action in his official capacity as a

15   public servant.

16       All in violation of 18 U.S.C. §§ 1952(a)(3)(A) and 2.

17                                   A TRUE BILL

18

19                                   /s/
                                     FOREPERSON OF THE GRAND JURY
20                                   Date:   April 13, 2023

21
     GARY M. RESTAINO
22   United States Attorney
     District of Arizona
23

24   /s/
     RYAN J. ELLERSICK
25   GORDON E. DAVENPORT III
     Assistant U.S. Attorneys
26

27

28