**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-22-00820-002-TUC-JCH (LCK) |
| Plaintiff, | **ORDER** |
| v. | |
| Constantine Panousopoulos, | |
| Defendant. | |

Defendant Constantine Panousopoulos filed a Motion to Suppress Pursuant to *Miranda* (Doc. 214). The Government filed a Response (Doc. 248), and Defendant filed a Reply (Doc. 264). Magistrate Judge Lynette C. Kimmins heard evidence and oral argument on January 13, 2025, *see* Doc. 287, and issued a Report and Recommendation ("R&R") in which she recommends denying the Motion to Suppress (Doc. 332). Defendant filed an Objection to the R&R (Doc. 362), and the Government responded (Doc. 366). For the following reasons, the Court will overrule Defendant's objections, adopt Judge Kimmins's R&R, and deny Defendant's Motion to Suppress.

**I.    Factual Background**

The R&R provides a detailed factual background to which Defendant has not objected. *See* Doc. 332 at 1–5. Accordingly, the Court will adopt the R&R's factual findings in full. Defendant's objections focus in part on issues of "confrontation with evidence of guilt" and the "degree of pressure" applied to Defendant. *See* Doc. 362 at 5–6. To address these concerns de novo, the Court also looks to the following additional facts for its

"totality of the circumstances" analysis.

During the execution of the search warrant, two agents in suits, Agent Alvarez and Agent Monahan, asked for and obtained Defendant's permission to interview him in his office conference room. *See* Doc. 332 at 3. Upon entering the conference room, Agent Alvarez again asked for and received Defendant's permission to sit at the table. IT[1] at 2. Agent Monahan asked Defendant if he wanted to sit at the head of the table, which Defendant declined. *Id.* at 2–3. She then asked Defendant where he'd like to sit because he was "the boss." *Id.* Finally, Agent Monahan asked if she could close the conference room door "for privacy," and Defendant again consented. *Id.* at 3.

Shortly after the agents asked Defendant a series of background questions and reminded him his participation in the interview was voluntary, *see* Doc. 332 at 3, the agents began to play for Defendant an audio recording of a discussion between Defendant and former Santa Cruz County Assessor Felipe Fuentes. IT at 5 ("We're gonna play this for you and this might help you with your memory okay?"). The agents questioned Defendant about the conversation. *See id.* at 5–6. Defendant provided some information but stated he could not remember the details of the conversation and was unable to hear the recording very well. *Id.* After several more questions, *Id.* at 6–16, Agent Monahan told Defendant she felt like he was lying and informed him it was illegal to lie to the FBI. *Id.* at 16. Agent Monahan then read Defendant a section of the U.S. Code to that effect and said, "I'm gonna ask you again," repeating a question. *Id.*

Throughout the interview, the agents told Defendant they already knew the answer to some of the questions they were asking. *Id.* at 33 ("But look look Mr. Panousopoulos we already know that he changes the value of the townhomes in Tubac for you . . .); *Id.* at 35 ("[A] lot of the questions that she's asking we know the answers to."); *Id.* at 36 ("We know of . . . another incident that happened in regards to a trailer park."); *Id.* at 41 ("Not if the FBI currently possesses that evidence?"); *Id.* at 38 ("[Y]ou do know we have emails between you and Hector Gutierrez and . . . Miguel Carrillo. . . . Oh we can provide it.").

---

[1] "IT" refers to the Interview Transcript from Defendant's January 27, 2022 interview with Agents Alvarez and Monahan.

The agents also implied they believed Defendant was lying several times and insinuated there would be damage to his reputation if he did lie. *Id.* at 36 ("[W]e don't wantcha to get in trouble with you lying to us but we know that . . . you said yourself the word right now 'favor.'"); *Id.* at 37 ("[B]ut what I don't wanna see is Mr. Panousopoulos uh you know lie to the FBI because then that would be . . . . I wanna give you the opportunity Mr. Panousopoulos with the legacy that you've built here in Nogales you could say no . . . but you built an incredible legacy here and I wantcha to just be honest with us with the relationship you had with him I wantchu to not forcing . . . but I'd like for you . . . to tell me."); *Id.* at 37 ("[I]f we don't do it the right way everyone here knows we're here.").

Near the end of the interview, shortly before the agents accompanied Defendant to his car to retrieve his phone, *see* Doc. 332 at 5, they informed Defendant that his sons had arrived and were outside. IT at 76. After Defendant gave the agents permission to search his phone, they informed Defendant his attorney had arrived, and they were going to "have to stop right now." *Id.* at 82. The agents provided Defendant with water at his son's instruction, had him sign a series of forms, and then escorted him outside to talk with his attorney about whether he should give consent to search his phone. *Id.* at 82–83.

## II.     Report and Recommendation Standard of Review

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If an objection is made, the Court "must review the magistrate judge's findings and recommendations de novo." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). The Court is obligated to review only the specific portions of the report, proposed findings, or recommendations to which the parties object. *See* § 636(b)(1). If, following review, "the district court is satisfied with the magistrate judge's findings and recommendations it may in its discretion treat those findings and recommendations as its own." *Morris v. Shin*, No. CV 20-322, 2023 WL 6248830, at *7 n. 5 (D. Ariz. Sept. 26, 2023) (quoting *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995)).

///

**III.    Analysis**

Defendant raises three primary objections to the R&R's findings. First, Defendant argues the R&R erred in framing its analysis around the *Kim* factors and "should have considered the *Craighead* factors on their own merits." Doc. 362 at 3. Next, Defendant objects to the R&R's application of the law to its specific factual findings on the issues of confrontation and duration. *Id.* Finally, Defendant objects to the R&R's application of the law to its specific factual findings on the subject of the degree of pressure applied to Defendant during the interrogation. *Id.* The Court will first address Defendant's objection to the way the R&R's analysis of the *Kim* and *Craighead* factors is structured and then conduct its own analysis of each factor.

**A. The R&R did not err in analyzing the *Kim* and *Craighead* factors concurrently.**

Defendant first argues the R&R erred in the way it utilized the *Kim* and *Craighead* factors to evaluate whether Defendant was in custody under the totality of the circumstances. *See* Doc. 362 at 3. The R&R structured its analysis around the five factors relevant to determining whether a person is in custody as outlined in *United States v. Kim*, 292 F.3d 969 (9th Cir. 2022). *See* Doc. 332 at 6. In analyzing the "physical surroundings of the interrogation" factor, the R&R looked to *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) for factors that help determine whether a space has become a "police-dominated atmosphere." Doc. 332 at 7 (citing 529 F.3d at 1083). Defendant argues the R&R should have considered the *Craighead* factors on their own merits rather than as part of the *Kim* analysis because *Craighead* establishes "the benchmark for custodial interrogations in locations outside of the police station." Doc. 362 at 3 (citing 539 F.3d at 1083).

In *Kim*, the Ninth Circuit identified and applied five factors to an interrogation that occurred in the defendant's place of business. *See* 292 F.3d at 971–72. Though the court found some factors "uninformative" or "neutralize[d]," *Id.* at 974, 977, it ultimately concluded the interrogation was custodial after "reviewing the factual findings under all of

the circumstances, including both the [*Kim*] factors and others," *Id.* at 974. In *Craighead*, the court addressed the analytical challenges of determining whether an individual "felt deprived of his freedom of action in any significant way, such that he would not have felt free to terminate the interrogation" when the interrogation was "conducted *within the home*." 539 at 1082. Much of the *Craighead* analysis is focused on the "uniqueness of an interrogation conducted within the suspect's home," and the court emphasized that even if an individual is told he is free to leave, he may not have anywhere to go. *Id.* at 1082–83. Accordingly, to determine whether an in-home interview was custodial, the court looked to "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" *Id.* at 1083.

Craighead has been applied to interrogations conducted in familiar locations outside the home. *See United States v. Bassignani*, 575 F.3d 879, 884 n. 6 (9th Cir. 2009). But Defendant provides no case law to support the proposition that the *Craighead* factors are the only applicable factors to evaluate whether an interview outside of a police station is custodial. The *Kim* factors in fact arise from a case concerning an interrogation that took place at the defendant's place of business. Further, in *Bassignani*, a Ninth Circuit case that followed *Craighead*, the court primarily used the *Kim* factors to evaluate whether an interview conducted in the defendant's office was custodial. 575 F.3d at 883–84. There, the court referenced *Craighead* in a footnote and did not conduct any analysis of the *Craighead* factors, differentiating the case in part because of the location. *Id.* at 884 n. 6. Accordingly, the R&R was not required to analyze the *Craighead* factors separately.

### B. The R&R correctly found the interview was non-custodial under the totality of the circumstances.

In determining whether an interview was custodial, courts look to whether, under the totality of the circumstances, "a reasonable person would believe that he or she was not free to leave." *Kim*, 292 F.3d at 973–74 (quoting *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir. 1987)). *Kim* identified five non-

exclusive factors that are particularly relevant to this inquiry:

> (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

*Id.* at 974 (citing *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)). The *Craighead* factors are relevant to determining whether a familiar environment[2] has been transformed into a "police-dominated atmosphere," making the interview custodial. 539 F.3d at 1084. *Craighead* found four, non-exhaustive factors particularly relevant to this issue:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Id.* Though the Court finds the R&R did not err in the way it structured its analysis, to fully address Defendant's concerns, the Court will analyze each of the *Kim* and *Craighead* factors in turn.

### 1. *The Language used to summon the individual*

In traditional settings, an interrogation is less likely to be custodial where a defendant "'agreed to accompany' officers to the police station or to an interrogation room." *Bassignani*, 575 F.3d at 884 (citing *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc)). In contrast, an interview is more likely to be considered custodial where a defendant was instructed or ordered to accompany officers. *See id.*

Here, Defendant was already present at his office when the agents arrived to serve the search warrant. *See* Doc. 332 at 2. Defendant met the agents at the door, and after his employees had left, he accompanied the agents back inside the office. Doc. 332 at 2–3. The

---

[2] As explained above, the *Craighead* factors were developed specifically to assist the court in "the task of sorting a non-custodial in-home interrogation from a custodial one." 539 F.3d at 1083. The "home" was an essential part of the *Craighead* analysis. *See e.g.*, *id.* at 1082 ("The usual inquiry into whether the suspect reasonably believed he could 'leave' the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home."). An individual's office is not on par with his home on the issue of whether he would have somewhere to go if he did leave.

1  agents did not summon or direct Defendant to the conference room. *See* IT at 2. Instead,

2  they asked Defendant for permission to use the conference room. *Id.* Defendant asked if he

3  could say no, and both agents responded telling him that he could "say no to anything" and

4  that he was not under arrest. *Id.*  Accordingly, this factor suggests Defendant was not in

5  custody. *See Kim*, 292 U.S. at 974–75. However, because Defendant was already present

6  when police arrived and did not travel to a different location, the Court gives this factor

7  limited weight. *See id.* at 974 ("Although Kim did arrive at the store voluntarily, she did

8  not do so to speak to the police. That the police did not summon her to the store in the first

9  place, imperatively or otherwise, is therefore entirely uninformative in determining the

10  dispositive question . . . .").

11      2.  *The extent to which the defendant is confronted with evidence of guilt*

12          The Ninth Circuit has "found a defendant in custody when the interrogator adopts

13  an aggressive, coercive, and deceptive tone." *Bassignani*, 575 F.3d at 884. Specifically, a

14  defendant is more likely to be in custody when law enforcement personnel accuse him of

15  lying and tell him they have evidence of the truth. *See Beraun-Panez*, 812 F.2d at 579. In

16  contrast, a defendant is less likely to be in custody "when the officers '[do] no attempt to

17  challenge [the defendant's] statements with other "known facts" suggesting his guilt, they

18  merely [ask] [him] about the allegations.'" *Bassignani*, 575 F.3d at 884 (quoting *United

19  States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005)).

20          Here, the agents began the interview with Defendant by playing a recording of

21  Defendant talking to Fuentes. IT at 5–8. They referenced the recording throughout the

22  interview, *see id.* at 33, and informed Defendant they were in possession of other evidence

23  against him, *see id.* at 33, 35, 36, 38, 41. The agents also accused Defendant of lying several

24  times. *See id.* at 16, 36, 37. Though the tone of the interview was friendly at times and

25  polite throughout, *see* Doc. 332 at 6–7, the agents consistently attempted to refute

26  Defendant's story with assertions that they knew the truth and had evidence of his guilt.

27  Accordingly, this factor weighs in favor of finding Defendant was in custody.

28  ///

### 3.  The physical surroundings of the interrogation

"An interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody." *United States v. Eide*, 875 F.2d 1429, 1437 (9th Cir. 1989). But even if an environment is familiar to a defendant, "isolating the defendant from the outside world . . . largely neutralizes the familiarity of the location as a factor affirmatively undermining a finding of coercion." *Kim*, 292 F.3d at 977. Here, like in *Kim* and *Bassignani*, Defendant was interviewed in his office, where he spends most of his time. The interview took place in the relative comfort of his own conference room, and there were only two agents present in the conference room with him. But also like in *Kim*, Defendant was the only employee allowed inside during the interview, and the agents "temporarily took complete control" over the office. *See* 292 F.3d at 971. The *Kim* court found that, despite the familiar location, the police presence and the defendant's isolation contributed to a finding that, under the totality of the circumstances, a reasonable person would not have felt free to leave. *Id.* at 977. *Compare Bassignani*, 575 F.3d at 885–86 (finding a defendant was not in custody when he was interviewed in his office conference room with people moving freely in and out). The familiarity of Defendant being in his own conference room must be balanced against the heavy law enforcement presence at the office and Defendant's isolation.[3] Nonetheless, this factor slightly favors a finding that Defendant was not in custody.

### 4.  The duration of the detention[4]

While longer interviews are more likely to be custodial, the length of an interview is not dispositive in determining whether a defendant was in custody. *Compare Bassignani*, 575 F.3d at 886 (finding a two-and-a-half-hour interview non-custodial), *with Kim*, 292 F.3d at 972 (finding a 45-minute interview custodial). A lengthy interview is custodial when it is a "marathon session designed to force a confession." *Bassignani*, 575 F.3d at

---

[3] *See infra* § III.B.8 for a further discussion of Defendant's isolation.

[4] Defendant argues this factor is not applicable in this context because it does "little to diminish the impact of the warrant's contemporaneous execution." Doc. 332 at 5. Again, Defendant cites no authority for this proposition. Accordingly, the Court will analyze this factor along with the other *Kim* and *Craighead* factors.

886 (quoting *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)). Here, Defendant's interview lasted approximately an hour and fifty-four minutes. Doc. 332 at 10. While lengthy, the interview does not appear to have been intentionally prolonged to wear Defendant down. A substantial portion of the interview was consumed with tangential conversation between Defendant and the agents or time spent looking for and retrieving Defendant's phone. *See* Doc. 332 at 10–11. While the interview was at points confrontational, the agents spent at least as much time bantering or having polite conversation with Defendant as they did asking pointed questions. There are times where the interaction is even friendly. Further, Defendant gave no indication that he wanted to speed up or end the interview. Judging by the recording, Defendant appeared to be comfortable and acting voluntarily. *See generally* IT. Accordingly, this factor is, on balance, neutral.

### 5. The degree of pressure applied to detain the defendant

An interrogation is much less likely to be found custodial when law enforcement personnel inform a defendant "he is not under arrest and is free to leave at any time." *Bassignani*, 575 F.3d at 886. But "[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*." *Craighead*, 539 F.3d at 1088. Such statements must be considered in the context of the delivery and "the scene as a whole." *Id.* (citing *United States v. Lee*, 699 F.2d 466, 467–68 (9th Cir. 1982)). In *Craighead*, the court found the defendant could reasonably have felt he was not free to leave notwithstanding officer statements that he was. *See* 539 F.3d at 1088. The court relied on the fact that there were personnel from three different agencies present, and the defendant was not sure that one agent's statements applied to the other agencies. *Id.* The court also emphasized the presence of an agent who seemed to be guarding the door of the interview room, the location of the interview in an unfurnished storage room in the back of the defendant's house, and the defendant's understandable reluctance to leave his home. *Id.* at 1088–89.

Here, the agents told Defendant he was not under arrest and the conversation was

voluntary multiple times. *See e.g.*, IT at 2–4, 37. Though Defendant was in a closed room with the agents sitting between him and the door, the agents asked Defendant if it was okay to close the door for "privacy," and Defendant chose where he wanted to sit. IT at 2–3. And not surprisingly, he chose to sit facing the door and not with his back to it. *See* Doc. 214 at 6. There is no evidence that the agents were guarding or blocking the door, and Defendant did not testify to being confused as to the agents' authority to allow him to leave. *See generally* HT.[5] Though some of the agents' assertions that Defendant's participation was voluntary were accompanied by statements apparently intended to convince him to cooperate, *see* IT at 37, persuasion is not enough to override the agents' explicit statements. Accordingly, this factor weighs strongly in favor of a finding that Defendant was not in custody.

### 6.  *The number of law enforcement personnel and whether they were armed*

"[T]he presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." *Craighead*, 539 F.3d at 1085 (finding the presence of eight, armed law enforcement officers, some of whom wore protective gear and unholstered their weapons in the defendant's presence, contributed to a police-dominated atmosphere). Here, there were 15 armed law enforcement agents present at Defendant's office, many of whom wore tactical gear. Doc. 332 at 3. There is no evidence that any of the agents unholstered their weapons. Only two of the agents were involved in the interview while the rest conducted the search. That said, the agents took control of the office as they searched, covering Defendant's security cameras. *See* Doc. 332 at 4. Accordingly, this factor favors a finding that the atmosphere was police-dominated, and the interview was custodial.

### 7.  *Whether the suspect was at any point restrained*

"When law enforcement agents restrain the ability of the suspect to move— particularly through physical restraints, but also through threats or intimidation—a suspect may reasonably feel he is subject to police domination . . . ." *Craighead*, 539 F.3d at 1085.

---

[5] "HT" refers to the transcript of the January 13, 2025 suppression hearing before Judge Kimmins.

A suspect may be found to be in custody "where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times." *Id.* (citing *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)). As discussed above, the agents did not physically restrain nor explicitly threaten or intimidate Defendant. The agents' attempts to persuade Defendant to cooperate by insinuating his reputation may be harmed if he did not are not coercive enough to constitute threats or intimidation.

The only fact that supports a finding that Defendant was retrained is that he was not allowed to move freely throughout the office. *See* Doc. 332 at 8–9. Though this monitoring may have been "necessary to the success of the lawful search," this does not lessen the tendency "to make a reasonable person believe he is in custody." *Craighead*, 539 F.3d at 1086. Accordingly, the individual fact that Defendant was escorted when walking through the office weighs in favor of a finding that Defendant was in custody. But this fact must be considered in the context of what occurred during the interview.

Defendant points to several interactions during the interview he argues made it custodial. *See* Doc. 362 at 6. At one point, when the agents were trying to find Defendant's phone, Defendant stood up as if to find it himself. IT at 70–71. Agent Monahan told Defendant, "you can stay right there," and asked if the ringer was on. *Id.* at 71. A similar interaction occurred when Defendant offered to help the agents find a paper in his desk. *Id.* at 54. There is no evidence that Defendant objected to the agents finding the items themselves or that his statements were any more than an offer to assist the agents. *Craighead*'s finding that the defendant's inability to move about the house without an escort constituted restraint also considered the armed agent guarding the door during the interview and the location in the defendant's home. *See* 539 F.3d at 1085–86. The facts here are distinct. Accordingly, the agents escorting Defendant through the office did not constitute restraint making the interview custodial. To the contrary, the Court finds Defendant never restrained. This factor favors a finding that Defendant was not in custody.

///

8. *Whether the suspect was isolated from others*

An interview is much more likely to be custodial when a suspect is removed "from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements." *Craighead*, 539 F.3d at 1086–87. As discussed above, here, Defendant was isolated because his employees were not allowed on the premises, and he remained alone with the agents. However, Defendant himself sent the employees home and subsequently chose to accompany the agents back into the building. Unlike in *Craighead* and *Kim*, no one asked to stay with Defendant, and Defendant did not ask that anyone stay with him. *See* 539 F.3d at 1087; 292 F.3d at 977. Further, when Defendant's sons and attorney arrived, the agents informed him and terminated the interview shortly thereafter. *See* IT at 84, 90–91. Accordingly, this factor weighs only slightly in favor of finding Defendant was in custody.

9. *Whether the suspect was informed that he was free to leave or terminate the interview*

As above, the agents told Defendant multiple times that he was not under arrest and his participation in the interview was voluntary. Further, Defendant did depart at the end of the interview. *See Crawford*, 372 F.3d at 1060 ("Being aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was noncustodial."). In *Craighead*, the court emphasized the fact that the interview took place in the defendant's home. 539 F.3d at 1088 ("These cases read together suggest that an agent's statement that a suspect is free to leave may have more or less resonance with the suspect depending on whether he can leave the interrogation site and retreat to the safety of his home or whether his home is in fact the locus of police activity."). Though Defendant's office may have functioned like a second home, the reality remains that Defendant could have "retreat[ed] to the safety of his home." Accordingly, the environment does not indicate Defendant was in custody where he was instructed multiple times that he was not under arrest and his participation in the interview was voluntary.

While several of the above factors favor a finding that Defendant was in custody,

taken together, the facts more strongly support a finding that Defendant was not in custody. There was heavy law enforcement presence in the office, and the interview was at times confrontational. But Defendant was in a comfortable, familiar environment, never restrained physically or by intimidation, and was explicitly told multiple times that his participation was voluntary and he was not under arrest. The *Kim* and *Craighead* factors serve only to assist the Court in answering the ultimate question of whether, under a totality of the circumstances, a reasonable person in Defendant's shoes would have felt free to terminate the interview and leave.  The Court is persuaded that the answer is yes. Review of the interview recording shows that Defendant interacted freely with the officers and gave no sign of discomfort or hesitation. *See e.g.*, IT at 10 ("I feel great."); *Id.* at 71–76 (casual discussion of Tesla and the evolution of cell phones); *Id.* at 77 (Defendant tells the agents, "I was kidding"). There is no indication that Defendant was in any way compelled to speak to the agents. Under the totality of the circumstances, the Court finds Defendant was not in custody for the purposes of *Miranda*.

**IV.     Order**

Accordingly,

**IT IS ORDERED adopting** the Report and Recommendation's (Doc. 332) factual findings and conclusion that the interview was non-custodial. Based on the R&R and the analysis above, Defendant's Motion to Suppress (Doc. 214) is **denied**.

Dated this 18th day of April, 2025.

John C. Hinderaker
United States District Judge